**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          ndeckant@bursor.com
          sbogdanovich@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM BUCKLEY, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br>     v.<br><br> AMC NETWORKS, INC.,<br><br>                    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff William Buckley ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Shudder.com ("Shudder") is an online streaming video platform owned and operated by Defendant AMC Networks, Inc. ("Defendant" or "AMC"), which broadcasts "the best selection of horror, thriller, and supernatural movies and series."[1]  Shudder broadcasts several Hollywood cult classics, such as the horror movie *Halloween*, as well as its own original programming.  The slogan of Shudder is "So Good, It's Scary," but the most unsettling thing about Shudder is that AMC installed "tracking pixels" on its website.  These tracking pixels secretly and surreptitiously send consumers' viewing histories to third-party providers like Meta Platforms, Inc. ("Meta" or "Facebook") without their consent, in violation of the Video Privacy Protection Act ("VPPA") and California Civil Code §1799.3.

2.    As Congress has recognized, "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)).  Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality—in other words, their most personal and intimate details.  *Id.*  In enacting the VPPA, Congress decided that this intimate information "should be protected from the disruptive intrusion of a roving eye."  *Id.*

3.    The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

---

[1] SHUDDER, https://shudder.com (last accessed 07/19/2023).

4.       AMC violated the VPPA by knowingly disclosing personally identifiable information ("PII")—including the specific videos and video services Plaintiff and Class members' requested and obtained—to unrelated third parties without their consent.  AMC installed computer code on Shudder, called the "Meta Tracking Pixel," which tracks and records Plaintiff and Class members' private video consumption.  Behind the scenes of many key Shudder webpages—and unbeknownst to video viewers—this code collects Plaintiff and Class members' video-consumption history and discloses it to Meta without their consent.  Meta, in turn, uses Plaintiff and Class members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.

## PARTIES

5.       Plaintiff William Buckley is, and has been at all relevant times, a citizen of California who resides in San Francisco, California.  During the relevant time period, Mr. Buckley has visited the Shudder website on his Google Chrome browser to watch videos, and at that time was logged into his facebook.com account on that same Google Chrome browser.

6.       Defendant AMC Networks, Inc. is a Delaware corporation with its principal place of business at 11 Penn Plaza, New York, New York, 10001.  Defendant develops, owns, and operates Shudder.com, which is used throughout California and the United States.

## JURISDICTION AND VENUE

7.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA).  And this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class and the California Subclass, and there is minimal diversity.

8.       This Court has personal jurisdiction over Defendant because it conducts substantial business within California, including the sale, marketing, and advertising of Shudder.  Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this state.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

**A.      The VPPA**

10.     The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

11.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

12.     As Senator Patrick Leahy explained, the VPPA was particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance.  These 'information pools' create privacy interests that directly affect the

> ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard.  The bill prohibits video stores from disclosing "personally identifiable information"—information that links the customer or patron to particular materials or services. In the event of an unauthorized disclosure, an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

13.     The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction-oriented.  It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider."  S. Rep. 100-599, at 12.

**B.     The Meta Tracking Pixel**

14.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2]  Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

15.     Meta owns facebook.com, and generates revenue by selling advertising space on this website, and other applications it owns, like Instagram.[6]

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[5] FACEBOOK, SIGN UP, https://www.facebook.com/

[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

16.    Meta sells advertising space by highlighting its ability to target users.[7]  Meta can target users so effectively because it surveils user activity both on and *off its site*.[8]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

17.    Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14]  One such Business Tool is the Meta Tracking Pixel.

---

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

---

18.     The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[15]  When the Meta Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

19.     Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[16] Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  An advertiser can also create their own tracking parameters by building a "custom event."[18]

20.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[20]  Pixel-specific Data includes "the Pixel ID and cookie."[21]

**C.     Shudder and the Meta Pixel**

21.     Shudder is a "premium streaming service with the best selection of horror, thriller, and supernatural movies and series uncut and commercial free."[22]  It has a variety of paid monthly

---

[15] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[19] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[20] *Id.*

[21] *Id.*

[22] SHUDDER, https://shudder.com (last accessed 07/19/2023).

and annual subscriptions options, which begin with a seven-day free trial. To sign up, consumers create an account and choose a password.

22.    From the moment consumers enter Shudder.com, Defendant invites a stalker – in the form of the Meta Tracking Pixel – to follow them and carefully watch their every move. Shudder consumers expect a movie night alone in the privacy of their own home; they do not expect to have their viewing histories recorded and sent to third parties through the use of tracking pixels.

23.    On Shudder sign-up pages, Defendant installed the Meta Tracking Pixel to track consumers' every move. In fact, it tracks no fewer than seven different events: "Initiate Checkout," "AddPaymentInfo," "Purchase," "StartTrial," and "PageView," with both "Microdata and Button Clicks Automatically Detected." *See* Figures 1-3.



**Figure 1**

///

///

///

///

///

///



**Figure 2**



**Figure 3**

24.     Enlarged versions of these events are reproduced below. See Figure 4-6.

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 4**                                    **Figure 5**

13
14
15
16
17
18
19
20
21

**Figure 6**

22

25.    Worse yet, the Meta Tracking Pixel continues to watch exactly what consumers

23
24

choose to watch once they enter Shudder's library.  On the next page is a screenshot of a portion of

25

the Shudder library of movies.

26
27
28



**Figure 7**

26.     At least three Meta Tracking Pixel events are installed on this page: PageView, along with Button Click and Microdata Automatically Detected.  When a user clicks on a particular movie title, the Meta Tracking Pixel transmits the Button Click event to Meta. This Button Click event contains various types of metadata which tell Meta exactly which video a consumer requested and obtained.  The "buttonText" metadata in this event conveys to Meta both the title of a specific video, along with a brief description of that video as well.  For example, if a consumer picks *An American Werewolf in London* in the Shudder library, Meta knows.



**Figure 8**



**Figure 9**

27.    When a visitor watches a video on Shudder while logged into Facebook, Defendant compels a visitor's browser to transmit an identifying "computer cookie" to Facebook called "c_user." The c_user cookie contains that visitor's unencrypted Facebook ID. When accessing the movie shown above, for example, the Shudder website is configured to have the user's browser send various cookies to facebook.com. Figures 10 through 12, next page, shows a copy of the c_user cookie being transmitted to facebook.com, as shown on the webpage by accessing developer tools by clicking the F12 button on a keyboard.

///

///

///

///

///

///

///



**Figure 10**

| | |
|---|---|
| ▼ Request Headers | |
| :Authority: | www.facebook.com |
| :Method: | GET |
| :Path: | /tr/? |
| | id=1110593182368166&ev=PageView&dl=https%3A%2F%2Fwww.shudder.com%2Fmovies& |
| | s=1689916920357&sw=1920&sh=1080&v=next&r=stable&ec=0&o=30&fbp=fb.1.16892913 |
| | e&dpo=&rqm=GET |
| :Scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | datr=IKMTZDnp92T5Bkqwh2LEBedt; sb=FXEXZF66qmf7QYrBRI0wetan; c_user=1528550551; |

**Figure 11**

| Name | Value | Domain | |
|---|---|---|---|
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com | |
| sb | FXEXZF66qmf7QYrBRI0wetan | .facebook.com | |
| c_user | 1528550551 | .facebook.com | |
| m_ls | %7B%22c%22%3A%7B%221%22%3A%22HCwA... | .www.faceboo... | |
| xs | 24%3ATWFeKjQ4G0FB5A%3A2%3A1679257972... | .facebook.com | |
| fr | 0t55TFt1AnXMetwyz.AWUdBkUjOWGxt4U6I1qW... | .facebook.com | |

**Figure 12**

28.     The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Facebook—to identify the individual consumer.  Specifically, if one types www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page.  For example, the c_user cookie in

1   Figures 7-9 above is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's

2   Facebook page.

3       29.    The Meta Tracking Pixel transmits additional cookies to Meta.

4       30.    The "fr" cookie contains, at least, an encrypted Facebook ID and browser

5   identifier.[23]  Facebook, at a minimum, uses the fr cookie to identify particular users.[24]

6       31.    Without a corresponding Facebook ID, the fr cookie contains, at least, an

7   abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted

8   advertising.

9       32.    The Meta Tracking Pixel uses both first and third-party cookies.  A first-party

10  cookie is "created by the website the user is visiting"—*i.e.*, Shudder.[25]  A third-party cookie is

11  "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*,

12  Facebook.[26]

13      33.    Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and

14  corresponding Facebook profiles.

15      34.    A Facebook ID is personally identifiable information.  Anyone can identify a

16  Facebook profile—and all personal information publicly listed on that profile—by appending the

17  Facebook ID to the end of https://facebook.com/.

18      35.    Through the Meta Tracking Pixel's code, these cookies combine the identifiers with

19  the event data, allowing Meta to know, among other things, that a given consumer subscribed to

20  Shudder.  And once the consumer accesses the Shudder library of videos, these identifiers also

21  allow Meta to know exactly which videos a consumer has requested and obtained.[27]

---

[23] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[24] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[25] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[26] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[27] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

36.     Shudder begins to collect this information through tracking pixels when a user first signs up for an account.

37.     Defendant discloses these identifiers so Meta can match them with a corresponding Facebook profile and link it to a subscriber's subsequent activity on Shudder.

38.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

39.     Meta confirms that it matches activity on Shudder with a user's profile.  Meta allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[28] The off-site activity report confirms Shudder identifies an individual's video viewing activities.

**D.     Plaintiff's Experience**

40.     In or around 2011, Plaintiff William Buckley created a Facebook account.

41.     In or around 2019, Plaintiff William Buckley created a Shudder account.  Once Plaintiff Buckley created an account, Defendant disclosed his PII to Meta.

42.     Since creating a Shudder account, Plaintiff William Buckley frequented Shudder to watch videos on a regular basis, including within the last 2 years.

43.     When Plaintiff William Buckley watched videos on Shudder, Defendant disclosed his event data, which recorded and disclosed the video's title and description to Meta.  Alongside this event data, Defendant also disclosed identifiers for Plaintiff Buckley including the c_user and fr cookies to Meta.

44.     By disclosing his event data and identifiers, Defendant disclosed Plaintiff Buckley's personally identifiable information to Meta.

---

[28] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

45.     Plaintiff Buckley discovered that Defendant surreptitiously collected and transmitted his personally identifiable information in July 2023.

## CLASS ALLEGATIONS

46.     **Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook and Shudder accounts, and viewed videos on Shudder.com (the "Class").

47.     **California Subclass Definition**: Plaintiff also seeks to represent a Class of similarly situated individuals defined as all Class members in the State of California (the "California Subclass").

48.     Subject to additional information obtained through further investigation and discovery, the above-described Class and California Subclass may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

49.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiff does not know the exact number of members of the aforementioned Class and California Subclass.  However, given the popularity of Defendant's website, the number of persons within the Class and California Subclass is believed to be so numerous that joinder of all members is impractical.

50.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and California Subclass that predominate over questions that may affect individual members of the Class and California Subclass include:

        (a)     whether Defendant collected Plaintiff's and the Class's PII;

        (b)     whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

        (c)     whether Defendant's disclosures were committed knowingly;

        (d)     whether Defendant's disclosures were committed willfully;

        (e)     whether Defendant disclosed Plaintiff's and the Class's PII without consent; and

(f)    whether Defendant's conduct violates California Civil Code § 1799.3.

51.    **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class and California Subclass, used Shudder to watch videos, and had his PII collected and disclosed by Defendant, and had his communications recorded by Defendant, without his consent.

52.    **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and Cal. Civ. Code § 1799.3.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class or Subclass.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class and California Subclass, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and California Subclass, additional claims as may be appropriate, or to amend the definition of the Class and California Subclass to address any steps that Defendant took.

53.    **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and California Subclass is impracticable.  Even if every member of the Class and California Subclass could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and

1    of the court system and protects the rights of each member of the Class and California Subclass.

2    Plaintiff anticipates no difficulty in the management of this action as a class action.

3                                   **CAUSES OF ACTION**

4                                         **COUNT I**
                                **Violation of the Video Privacy Protection Act**
5                                 **18 U.S.C. § 2710, *et seq.***

6    54.    Plaintiff hereby incorporates by reference the allegations contained in all preceding

7    paragraphs of this complaint.

8    55.    Plaintiff brings this claim individually and on behalf of the members of the

9    proposed Class and Subclass against Defendant.

10    56.    Defendant is a "video tape service provider" because it creates, hosts, and delivers

11    thousands of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or

12    foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio

13    visual materials." 18 U.S.C. § 2710(a)(4). In particular, Defendant provides a library of

14    audiovisual material for a monthly fee.

15    57.    Plaintiff and members of the Class are "consumers" because they have paid to

16    watch videos on Shudder have accounts with Shudder. 18 U.S.C. § 2710(a)(1).

17    58.    Defendant disclosed to a third party, Facebook, Plaintiff's and the Class members'

18    personally identifiable information. Defendant utilized the Meta Tracking Pixel to compel

19    Plaintiff's web browser to transfer Plaintiff's identifying information, like his Facebook ID, along

20    with Plaintiff's event data, like the title of the videos he viewed.

21    59.    Plaintiff and the Class members viewed videos using Shudder.

22    60.    Defendant knowingly disclosed Plaintiff's PII because it used that data to build

23    audiences on Facebook and retarget them for its advertising campaigns.

24    61.    Plaintiff and Class members did not provide Defendant with any form of consent—

25    either written or otherwise—to disclose their PII to third parties.

26    62.    Nor were Defendant's disclosures made in the "ordinary course of business" as the

27    term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    17

necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

63. On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## <u>COUNT II</u>
### Violation of California Civil Code § 1799.3

64.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

65.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

66.    Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

67.    Defendant is a "person providing video recording sales … services" because it sells access to its online video stream platform, Shudder.com, and thereby creates, hosts, and delivers thousands of videos on its website.

68.    Defendant disclosed to a third party, Meta, Plaintiff's and the Class members' personally identifiable information.  Defendant utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook ID, along with Plaintiff's event data, like the title of the videos they viewed.

69.    Plaintiff and the California Subclass members viewed videos using Shudder.

70.    Defendant willfully disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

71.     Plaintiff and California Subclass members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

72.     On behalf of himself and the California Subclass, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the California Subclass by requiring Defendant to comply with Cal. Civ. Code §1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of the Cal. Civ. Code §1799.3 pursuant to Cal. Civ. Code §1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class and California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as a representative of the Class and California Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and California Subclass;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class and California Subclass on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  July 21, 2023                    **BURSOR & FISHER, P.A**.

By:   */s/ Stefan Bogdanovich*
Stefan Bogdanovich

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

L. Timothy Fisher (State Bar No. 191626)
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        ndeckant@bursor.com
        sbogdanovich@bursor.com

*Attorneys for Plaintiff*